1
2
3
4
5
6
7

WEEKS & LAIRD PLLC
2223 E. Speedway Blvd.
Tucson, AZ  85719
Tel 520-318-1209
Fax 520-327-3118
Brian A. Laird, SBN 020541
Laird@WeeksLaird.com
Stephen M. Weeks, SBN 020726
Weeks@WeeksLaird.com
**Attorneys for Plaintiff**

8
9

### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF ARIZONA

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

STEVEN J. BLOMQUIST and SHARYL
V. CUMMINGS, husband and wife
                    PLAINTIFFS,
v.

TOWN OF MARANA, an Arizona
Municipal Corporation, T. P. ("Terry")
and JANE DOE TOMETICH, husband
and wife; SCOTT BENNETT and JANE
DOE BENNETT, husband and wife;
JASON RITTER and JANE DOE
RITTER, husband and wife; ROBERTO
JIMENEZ and JANE DOE JIMENEZ,
husband and wife;  TIMOTHY FANE and
JANE DOE FANE, husband and wife;
MONTGOMERY WILLIAMS and JANE
DOE WILLIAMS, husband and wife;
JOHN DOE MONTGOMERY and JANE
DOE MONTGOMERY, husband and
wife; TIM BRUNENKANT and JANE
DOE BRUNENKANT, husband and wife;
FRANK CASSIDY and RENEE

**CASE NO.: 4:09-CV-00671-
TUC-DCB**

**FIRST AMENDED COMPLAINT**

CASSIDY, husband and wife; JOHN and
JANE DOES 1-100, Marana Town
Officials involved in the underlying
wrongful acts,

DEFENDANTS.

**NOW COME** Plaintiffs, Steven J. Blomquist and Sharyl V. Cummings, by
and through Counsel undersigned, and for their claims for relief, allege and aver as
follows upon information and belief:

JURISDICTION

I.

1. This Court has jurisdiction over the subject matter of this action
pursuant to 28 U.S.C. §1331 as this suit arises under 42 U.S.C.
§§1983 and 1988.

2. To the extent any claim is deemed a state law claim and or is subject
to supplemental jurisdiction, jurisdiction over such claims is
appropriate under principles of supplemental jurisdiction as set forth
in 28 U.S.C. §1367.

PARTIES

II

3. Plaintiffs Steven J. Blomquist ("Mr. Blomquist") and Sharyl V.
Cummings (Ms. Cummings) are husband and wife, Arizona residents,
and United States' citizens.

4.    Defendant Town of Marana is an Arizona Municipal Corporation.

5.    Plaintiffs do not currently have the full names of all defendants. Unless otherwise specified, if a first name is unknown, plaintiffs will use "John Doe" coupled with the last name for defendants believed to be male and "Jane Doe" coupled with the last name for defendants believed to be female.

6.    Defendant T. P. "Terry" Tometich is an Arizona resident and the Town of Marana's Chief of Police.

7.    Defendant Jane Doe Tometich is the spouse, if any, of T. P. "Terry" Tometich, and the acts complained of herein were for the benefit of the marital community, and bound the marital community, to the extent it exists.

8.    Defendant Scott Bennett is an Arizona resident and a Marana Police Department police officer with badge number 385.

9.    Defendant Jane Doe Bennett is the spouse, if any, of Scott Bennett, and the acts complained of herein were for the benefit of the marital community, and bound the marital community, to the extent it exists.

10.   Defendant Jason Ritter is an Arizona resident and a Marana Police Department police officer with badge number 315.

11.    Defendant Jane Doe Ritter is the spouse, if any, of Jason Ritter, and the acts complained of herein were for the benefit of the marital community, and bound the marital community, to the extent it exists.

12.    Defendant Roberto Able (last name currently unknown, with Able substituted as a temporary fictitious identifying last name) is an Arizona resident and believed to be a member of the Marana Police Department and/or a Town of Marana employee.

13.    Defendant Jane Doe Able is the spouse, if any, of the defendant currently identified as Roberto Able, and the acts complained of herein were for the benefit of the marital community, and bound the marital community, to the extent it exists.

14.    Defendant Montgomery Williams is an Arizona resident and Marana Police Department police officer with badge number 316.

15.    Defendant Jane Doe Williams is the spouse, if any, of defendant Montgomery Williams, and the acts complained of herein were for the benefit of the marital community, and bound the marital community, to the extent it exists.

16.    Defendant John Doe Montgomery is an Arizona resident and Marana Police Department police officer with badge number 183.

17.   Defendant Jane Doe Montgomery is the spouse, if any, of John Doe Montgomery, and the acts complained of herein were for the benefit of the marital community, and bound the marital community, to the extent it exists.

18.   Defendant Tim Brunenkant is an Arizona resident and Marana Police Department police officer with badge number 161.

19.   Defendant Jane Doe Brunenkant is the spouse, if any, of Tim Brunenkant, and the acts complained of herein were for the benefit of the marital community, and bound the marital community, to the extent it exists.

20.   Defendant Frank Cassidy is an Arizona resident and Town of Marana's Town Attorney.

21.   Defendant Renee Cassidy is the spouse, if any, of Frank Cassidy, and the acts complained of herein were for the benefit of the marital community, and bound the marital community, to the extent it exists.

22.   Defendants John and Jane Does 1-100 are Marana town officials whose identities and involvement in the underlying claims are unknown or uncertain and who have played a part in causing damages to plaintiffs.

<u>GENERAL ALLEGATIONS</u>

### III

Background

23. On June 26, 2008, Plaintiffs Steven Blomquist and Sharyl Cummings joined in Pima County Superior Court case number C-20083779 as members of the public suing various entities involved in the development of a Marana subdivision known as Saguaro Ranch ("Saguaro Ranch").

24. Prior to the developer purchasing any land within Saguaro Ranch, a publicly dedicated, 50-foot wide, ingress and egress easement (the "Easement") wound in and out through what would become the Saguaro Ranch subdivision.

25. The Easement is recorded at docket 7718 pages 333 in the Pima County Recorder's Office.

26. One end of the Easement touches and/or intersects the Thornydale Right-of-Way.

27. The Easement's other end stopped just North of where the restaurant McClintock's Restaurant at Saguaro Ranch ("McClintock's") currently exists.

28. McClintock's was built directly on top of a portion of the Easement.

29.    The Easement's purpose was to allow the Public ingress and egress access to some of the most pristine and scenic land in all of southern Arizona.

30.    When the Easement was dedicated, fee title to the underlying land remained vested in the original owners with the Public merely having an ingress and egress right.

31.    Beginning in or around May 2001, the Saguaro Ranch developer, Stephen Phinny, by and through his various companies, began purchasing up lots within what would eventually become Saguaro Ranch.

32.    Where the Easement ran through a particular parcel, an exception was specifically noted on the deed conveying title to the developer's company.

33.    For example, Mr. Phinny's company Saguaro Canyon Ranch, LLC purchased some real property from Donald H. Albright as reflected in a warranty deed recorded at docket 11561 page 280 (the "Albright Deed").

34.    The Albright Deed conveyed the real property set forth in the Albright Deed's attached Exhibit A, "Subject to the Items set forth in Exhibit 'B' attached hereto and made a part hereof."

35.  The Albright Deed provided an exception for the Easement in Exhibit B, which provides in relevant part, "3. Easements and rights incident thereto, as set forth in instrument . . . Docket 7718, page 333".

36.  Similar language is found in all deeds where the conveyed land touched the Easement.

37.  As a result, the developer never purchased any rights in the Easement.

38.  Instead, the developer purchased all of the available rights except for certain items like the Easement.

39.  When the developer tried to block off access to the Easement, members of the public approached Frank Cassidy, Marana's town attorney.

40.  Mr. Cassidy urged those Public members to pursue a declaratory judgment act action against the developer.

41.  Mr. Cassidy informed those Public members that the developer did not have a legal basis for blocking the Easement.

42.  In October, 2008, when he was deposed in the Saguaro Ranch case, Mr. Cassidy readily acknowledged urging the Plaintiffs to take Saguaro Ranch to court.

43.  Mr. Cassidy testified on October 29, 2008:

> Q.  Okay.  Did you encourage the parties to engage
> Council to get a declaration from the court's as to

the rights and responsibilities related to this easement.
A.  Yes.  (6:25-7:4)

44.  Mr. Cassidy also acknowledged in his deposition that the Easement did not deed any property to the Town of Marana and that the only rights the Town received were rights to use the Easement as a member of the public.

Q.   And this easement doesn't specifically deed any property to the Town of Marana, does it?
A.   As far as I know, it doesn't, but it's a -- an easement to the public, so to the extent the land is located in the Town of Marana, the Town of Marana represents the public, so that in my opinion, the Town of Marana, to the extent this is a valid public easement, does get easement rights from this document.

45.  In or around 2003, some of the land in the area of Saguaro Ranch became incorporated within the boundaries of the Town of Marana.

46.  The Easement's dedication preceded the Town of Marana's incorporation of portions of the Easement.

47.  During the public's lawsuit against the Saguaro Ranch entities, members of the public, including plaintiffs, regularly and routinely walked the Easement carrying protest signs, and exercising their First Amendment right to free speech.

48.   In late 2008, based in part on Mr. Cassidy's deposition, the Public filed a motion for summary judgment against Saguaro Ranch entities.

49.   Shortly before the motion was set to be heard by the judge in the case, the Town of Marana learned of the motion.

50.   The Town of Marana then decided to try to "abandon" the Easement.

51.   The trial court postponed a hearing on a motion for summary judgment pending the outcome Of the Marana Town Council Meeting.

52.   The Marana Town Council meeting to consider the "abandonment" agenda item was set for February 03, 2009.

53.   At that meeting, a record number of Marana citizens, and members of the public at large, attended and voiced strong public opposition to the agenda item.

54.   A couple of days after the meeting, Gilbert Davidson, Marana's Town Manager, announced that the Town of Marana would conduct a three-phase study of the public's interest in the Easement and would hold further meetings before rendering any decision.

55.   On February 13, 2009, multiple Saguaro Ranch entities filed for bankruptcy protection.

56.   The bankruptcy proceedings instituted an automatic stay which prevented the state court judge from being able to immediately address and rule on the pending motion for summary judgment.

57.   Two of the Saguaro Ranch entities listed as an asset in the bankruptcy a $135 Million claim against the Town of Marana **and** its officials.

58.   Marana Town Council meetings are usually held on Tuesday evenings.

59.   On Tuesday, May 19, 2009, an election was held and all incumbents on the Marana Town Council who were up for election were reseated.

60.   Since the election was on a Tuesday, the next Marana Town Council meeting was scheduled for May 21, 2009, a Thursday.

61.   On May 20, 2009 with just over 24 hours remaining before a town Council meeting scheduled on the unusual Thursday evening, a consent agenda item was added and declared to be an emergency.

62.   The item added on May 20, 2009 purported to "abandon" the Easement.

63.   On May 21, 2009, the Marana Town Council passed the emergency agenda item purporting to "abandon" the Easement.

64.   At that May 21, 2009 Marana Town Council meeting, Frank Cassidy announced to the Public in attendance, including plaintiffs, that, as

and from that vote, any member of the public walking on the Easement would be cited for criminal trespass.

65.   The Town of Marana then entered into a side agreement with the Saguaro Ranch entities.

66.   Under the agreement, Saguaro Ranch would only call the Marana Police Department on individuals who walked the Easement while carrying protest signs.

67.   On May 26, 2009, Plaintiffs walked on the Easement, carrying their protest signs.

68.   Officer Williams stopped plaintiffs and informed them that he would not arrest them but that other officers might if they were found walking on the Easement again with their protest signs.

69.   On May 27, 2009, Plaintiffs walked on the Easement, carrying their protest signs.

70.   Officer Williams and Officer Fane of the Marana Police Department apprehended plaintiffs, separated them, and placed them in the back of their respective police vehicles, and took them down the hill.

71.   Officer Williams and Officer Fane were informed that, under the circumstances, where protesters exercising their First Amendment rights were being targeted by the Town of Marana, the issuance of a

citation for criminal trespass on a disputed Easement could expose the officers to being named as a party to a civil rights lawsuit.

72.   It was explained that, though plaintiffs have the utmost respect for the officers and believe the officers are being forced to act in violation of constitutional rights under duress and/or fear of repercussions from the Town or their superiors, under applicable law naming the officers as parties in a civil rights lawsuit was pretty much required under most circumstances.

73.   Officer Fane contacted the town attorney, either directly or through a proxy, and was informed that the Town of Marana would indemnify him, and all officers, for their unconstitutional conduct and that he should proceed with the policy established by Frank Cassidy at the May 21, 2009 meeting.

74.   It is the policy of Marana to indemnify its officers for their intentional and unconstitutional acts so long as those acts are targeted at select individuals such as Plaintiffs Blomquist and Cummings.

75.   Marana's policy of encouraging civil rights violations against targeted individuals exercising their right to free speech sets up a situation where Officers feel there is no requirement to question, or problem

with ignoring, unlawful orders when they are applied to particular individuals, such as Plaintiffs.

76.   After receiving assurances that the Town would indemnify him for any unconstitutional/wrongful conduct he committed, Officer Fane issued criminal trespass citations to plaintiff Steven Blomquist and plaintiff Sharyl Cummings.

77.   A reasonable officer should have known that the intentional targeting of protesters for criminal trespass citations was an attempt to violate the First Amendment free-speech provisions.

78.   On May 29, 2009, Officer Williams, after learning of the indemnity, was dispatched to Saguaro Ranch regarding protestors.

79.   On May 29, 2009, Officer Williams again made contact with Plaintiffs Blomquist and Cummings while they were carrying their signs on the Easement.

80.   On May 29, 2009, Officer Williams told Plaintiffs Blomquist and Cummings that he had no choice, was under orders, and was required to cite them for criminal trespassing while walking on the Easement, carrying their signs.

81.   On June 1, 2009, Officer Montgomery after learning of the previous incidents which included a discussion of the indemnity, was dispatched to Saguaro Ranch regarding protestors.

82.   On June 1, 2009, Officer Montgomery made contact with Plaintiffs Blomquist and Cummings while they were carrying their signs on the Easement.

83.   On June 1, 2009, Officer Montgomery told Plaintiffs Blomquist and Cummings that his supervisor told him that they were under orders to cite them for criminal trespassing while walking on the Easement, carrying their signs and if they showed up protesting on the Easement again, they would be incarcerated at Pima County Jail.

84.   On and after June 1, 2009, up through the initial dismissal of the criminal charges on August 21, 2009, the Town of Marana successfully halted Plaintiffs' expression of the free speech rights.

85.   On August 21, 2009, the prosecutor filed a motion to dismiss the claims against Steven Blomquist and Sharyl Cummings without prejudice.

86.   On the evening of August 21, 2009, Steven Blomquist and Sharyl Cummings began to walk the public Easement, once again carrying their signs.

87.   During and after the same time frame, other members of the public, those without protest signs, made use of the Easement as bike and walking paths without harassment and without being questioned by the Marana Police Department.

88.   The Marana Police Department only targeted and cited certain members of the public who carried protest signs.

89.   On October 14, 2009, the judge revisited the ruling dismissing the case without prejudice against Steven Blomquist and Sharyl Cummings.

90.   The judge entered an order dismissing the case with prejudice, and wrote onto the order that **Marana had improperly used the criminal process against Plaintiffs Steven Blomquist and Sharyl Cummings.**

91.   Between August 21, 2009 and November 12, 2009 the developers employees, at the developers order, repeatedly made false claims to the Marana Police Department that Steven Blomquist and Sharyl Cummings were trespassing.

92.   The Marana Police Department repeatedly informed the Saguaro Ranch employees that Steven Blomquist and Sharyl Cummings could not be convicted for trespassing.

93.   On and after the October 14, 2009 ruling which held that Marana had improperly used the criminal process against plaintiffs Steven Blomquist and Sharyl Cummings the Marana Police Department officers were made aware of the ruling.

94.   On and after the October 14, 2009 ruling which held that Marana had improperly used the criminal process against plaintiffs Steven Blomquist and Sharyl Cummings, the Marana Police Department officers were repeatedly and continually called out to investigate false claims of trespassing filed by Saguaro Ranch employees.

95.   Each time, if the officer saw either Steven Blomquist or Sharyl Cummings, the officers would stop them, ask them questions, and otherwise interfere with their protest activities.

96.   The pattern and behavior of stopping, questioning and temporarily detaining Steven Blomquist and Sharyl Cummings is:

(a) A tremendous waste of public resources

(b) A policy and pattern of harassing individuals exercising their constitutional rights.

97.   At some point after the October 14, 2009 ruling, Marana Police Department officers began policing the private streets and ways of Saguaro Ranch whether they had been dispatched or not.

98.   At some point after the October 14, 2009 ruling, Marana Police Department officers began coaching Saguaro Ranch employees on what steps they can take to try and create a basis for arresting Steven Blomquist and Sharyl Cummings.

99.   Such coaching included advising Saguaro Ranch employees to find "neutral" witnesses who could act as individuals whose "peace was disturbed" so that Steven Blomquist and or Sharyl Cummings could be arrested for disturbing the peace.

100.  It is believed that Saguaro Ranch found, hired, or otherwise procured individuals to act as "disturbed" patrons of McClintock's.

101.  It was unclear to plaintiffs why the town of Marana had become a de facto security force for Saguaro Ranch.

102.  Then, on November 19, 2009, a cover story on the easement dispute was run in the Tucson Weekly.

103.  In the article, Saguaro Ranch's bankruptcy attorney, Eric Sparks, was interviewed.

104.  The Article provides in relevant part,

> "Sparks explains that when the bankruptcy was filed, the town of Marana hadn't moved to abandon the west-side easement. If the town hadn't moved forward with abandoning the Thornydale right of way, Sparks says, his client would have sued. (The

$135 million is what Phinny estimates as the value of the development.)

"'We did not pursue it, and the town went ahead and abandoned the easement,' Sparks says."

105. As the $135 Million claim was against the Town **and** its officials, it is reasonable to infer that the town council members may have sold their vote, or tried to give a gift unconstitutional under Arizona's constitution to the developer in exchange for avoiding the potential for serious personal liability.

106. Upon information and belief, the town of Marana, and its officials, have an agreement with the developer to intentionally deprive plaintiffs civil rights as a part and parcel to the agreement to drop the $135 million claim.

107. Upon information and belief, the Town Council and/or officers may still be experiencing some form of blackmail-like activity from the Developer leading to the Town's continuing activities against Blomquist and Cummings.

108. These issues came to a head on November 13, 2009 when Steven Blomquist was arrested **and** incarcerated on the same trespassing charge as had previously been dismissed as being an improper use of

the criminal process, coupled with a new trumped up charge of disorderly conduct.

109.  There is and was no evidence for either charge.

110.  The arresting officer apologized to Mr. Blomquist and informed Mr. Bloomquist that he had no discretion in the matter and was under orders to arrest him and take him down to Pima County jail.

The Incarceration of Steven J. Blomquist, In Detail

111.  On November 13, 2009 at approximately 4:45 PM, Plaintiff Steven Blomquist walked into the parking lot surrounding McClintock's.

112.  McClintock's is a restaurant in Marana, Arizona.

113.  Portions of McClintock's, including the porch area, are built on the dedicated public easement.

114.  At approximately 4:48 PM, Plaintiff Steven Blomquist walked up the steps at the front of McClintock's and sat down at a porch (outside) table, greeting a member of McClintock's staff with the words, "Good Afternoon".

115.  Plaintiff Steven Blomquist's sitting on the porch in the public easement was a constitutionally protected free speech expression, communicating to the Town of Marana, the McClintock's owners and staff, and the public at large, that members of the public were entitled

to full rights of access to any place within the dedicated public easement.

116.   At approximately 4:50 PM, a McClintock's staff member asked Mr. Blomquist "How are you doing?"

117.   Mr. Blomquist responded, "Just fine," and asked, "So what time do you start serving beer?"

118.   The waiter responded that they could serve Mr. Blomquist once the restaurant opened at 5:00 PM.

119.   At approximately 4:52 PM the McClintock's waiter walked by and Mr. Blomquist said, "So, when you are officially open, I would like to order a beer."

120.   The waiter then volunteered that McClintock's had Bud, Bud Lite, Pacifico, and Corona.

121.   Mr. Blomquist ordered a Pacifico.

122.   At approximately the same time, Erv Schultz, McClintock's general manager called 911 and reported that Mr. Blomquist was sitting on the front porch "taunting us".

123.   At approximately 4:53, a McClintock's staff member, Justin Fuhrman, came outside and greeted Mr. Blomquist, and an exchange along the following took place:

Mr. Fuhrman:  "How are you doing?"

Mr. Blomquist:  "I'm good.  I'm good."

Mr. Fuhrman: "Good."

Mr. Blomquist: "I got tired. Walking up the hill was hard work, I got to rest.  I needed a beer."

Mr. Fuhrman:  "You need a beer?"

Mr. Blomquist:  "Yeah, I just ordered one."

124.   At approximately 4:53 PM the Marana Police Department's Officer Bennett, Badge Number 385 was dispatched to McClintock's.

125.   At approximately 4:54 PM a staff member from McClintock's made a statement to the effect of "I mean no disrespect" as he took a photograph of Mr. Blomquist.

126.   Mr. Blomquist told the staff member that it was okay to take the photo, stating words to the effect of, "I understand completely".

127.   At approximately 4:56 PM a McClintock's kitchen employee came out to the porch and an exchange along the lines of the following took place:

Kitchen Employee:  "What's up boss?"

Mr. Blomquist:  "Good evening.  How are you?"

Kitchen Employee:  "Living the dream, and yourself."

Mr. Blomquist:  (Laughing) "That's a good way to put it.  Yeah, I could probably get into that."

128.  At about this time, Erv Schultz was videotaped on the roof of McClintock's apparently engaged in a several minutes long cell phone call with someone.

129.  At approximately 4:58 PM the waiter walked by and asked words to the effect of, "Did Eric come by with your beer yet?"

130.  To which, Mr. Blomquist responded, "No."

131.  The waiter then informed Mr. Blomquist that he would look into it.

132.  At approximately 5:01 PM a McClintock's employee named Jacob came up to Mr. Blomquist, serving him a Pacifico beer, and an exchange along the lines of the following took place:

Jacob:  "Sir, I don't think I have had the pleasure of meeting you.  My name is Jacob."

Mr. Blomquist:  "Hello Jacob, my name is Steve Blomquist.  Steve. I'm sure you have seen me here. . ."

Jacob:  "Yeah, I've seen you before."

Mr. Blomquist: "Before.  It is interesting, this is my favorite table. The last time I was here and was served I sat at this table. But, thank you.  I'm surprised.  I thought they might not serve me."

23

Jacob:  "Oh.  I didn't hear anything so."

Mr. Blomquist:  "Good job.  Thank you."

Jacob:  "You're welcome."

133.  At approximately 5:02 PM Jacob came back and an exchange along the lines of the following took place,

Jacob:  "Sir, I'm sorry.  But, Erv told me I had to take this [the beer] away from you."

Mr. Blomquist:  "That's your prerogative."

134.  At approximately 5:02 PM, Jacob took the Pacifico from Mr. Blomquist.

135.  Mr. Blomquist was not asked to leave the porch.

136.  At approximately 5:03 PM another employee came out and had an exchange along the lines of the following with Mr. Blomquist:

Mr. Blomquist:  "How are you tonight?"

Employee:  "Pretty good.

Mr. Blomquist:  "Good"

Employee:  "How about you?"

Mr. Blomquist:  "Yeah, fine."

Employee:  "Doing good?"

Mr. Blomquist:  "Yeah, really good. It just gets better."

137. The employee laughed and walked on.

138. Someone, Steven Phinny and/or one or more other Town Officials currently identified as John and Jane Does, may have told Mr. Schultz to make false statements to the arriving officer as part of a conspiracy to deprive Steven Blomquist of his civil rights.

139. At approximately 5:09 PM Officer Bennett arrived at McClintock's.

140. Officer Bennett went in to speak to McClintock's manager, Erv Schultz.

141. As part of the conspiracy to deprive Steven Blomquist of his civil rights, Erv Schultz made multiple false statements to Officer Bennett which are recorded in Officer Bennett's police report.

142. Mr. Schultz falsely told Officer Bennett that Mr. Schultz had refused to serve Mr. Blomquist a beer.

143. The statement is false because Mr. Blomquist was served a Pacifico by a waiter named Jacob.

144. That the waiter Jacob subsequently came back and asked Steven Blomquist to return the beer, does not change the fact that the beer was, indeed, served.

145. Mr. Schultz falsely told Officer Bennett that he had told Mr. Blomquist that Mr. Blomquist was not welcome to patronize McClintock's.

146. The statement is false because Mr. Schultz did not speak with Mr. Blomquist.

147. The statement is false because no agent of Mr. Schultz told Mr. Blomquist that Mr. Blomquist was not welcome to patronize McClintock's.

148. Indeed, those members of McClintock's staff with whom Mr. Blomquist interacted were pleasant, professional and courteous, even apologizing when they felt that they were in the wrong (such as when Jacob had to take the beer, and when others were ordered to take Mr. Blomquist's photograph).

149. Mr. Schultz falsely told Officer Bennett that Mr. Schultz had told Mr. Blomquist that Mr. Blomquist was trespassing and had trespassed numerous times.

150. The statement is false because Mr. Schultz did not speak with Mr. Blomquist and did not tell Mr. Blomquist anything.

151. The statement is false because no agent of Mr. Schultz told Mr. Blomquist anything.

152.   Mr. Schultz falsely told Officer Bennett that Mr. Blomquist refused to leave the porch when asked by Mr. Schultz.

153.   The statement is false because Mr. Schultz did not speak with Mr. Blomquist and did not tell Mr. Blomquist anything.

154.   The statement is false because no agent of Mr. Schultz told Mr. Blomquist anything.

155.   Mr. Schultz did make an honest statement to Officer Bennett when he told Officer Bennett that Mr. Blomquist was exercising his free speech rights.

156.   Officer Bennett's report of the incident provides, "Mr. Schultz stated that Mr. Blomquist was trying to make a 'in your face' statement that he could go and sit wherever he pleased."

157.   Officer Bennett knew, or should have known, that Mr. Blomquist has a constitutional right of free speech.

158.   Officer Bennett's report also falsely claims that Steven Blomquist, "was sitting on the patio area antagonizing customers."

159.   At no time did Mr. Blomquist antagonize any customers.

160.   At approximately 5:22 PM Officer Bennett approached Mr. Blomquist (the "Custodial Arrest").

161.   Shortly before the Custodial Arrest, Defendant Officer Ritter had joined Defendant Officer Bennett at McClintock's.

Chief T.P. Tometich Gets Pressured to Arrest Mr. Blomquist

162.   A John or Jane Doe Town Official learned that Mr. Blomquist was sitting on McClintock's porch directly from Erv Schultz, or through a third party John or Jane Doe who Erv Schultz contacted.

163.   Prior to the Custodial Arrest, an unidentified John or Jane Doe Town Official called Marana's Police Chief, T.P. Tometich (the "Pressure Phone Call") and informed him of Mr. Blomquist's presence at McClintock's and ordered the Chief of Police to have Mr. Blomquist arrested and taken to Pima County Jail.

164.   Something in the Pressure Phone Call induced, forced, or compelled T.P. Tometich to intentionally violate Mr. Blomquist's constitutional rights.

165.   Something in the Pressure Phone Call induced or compelled T.P. Tometich to intentionally ignore police procedure.

166.   Something in the Pressure Phone Call induced or compelled T.P. Tometich to ignore recent court rulings and state law.

167. Something in the Pressure Phone Call induced or compelled T.P. Tometich to manufacture a trumped up disorderly conduct charge against Mr. Blomquist.

168. Something in the Pressure Phone Call induced or compelled T.P. Tometich to manufacture a trumped up trespassing charge against Mr. Blomquist.

169. Upon information and belief, Chief Tometich was promised indemnity and or other benefits in exchange for his ordering the wrongful arrest of Steven Blomquist.

The Conspiracy to Deprive Steven Blomquist of his Civil Rights

170. The decision to wrongfully arrest Mr. Blomquist was made in the Pressure Phone Call between T.P. Tometich, and/or the John or Jane Does involved in the call to T.P. Tometich.

171. On October 14, 2009, less than one month before T.P. Tometich's order to arrest and incarcerate Steven Blomquist for trespassing, a Judge of competent jurisdiction dismissed a previous criminal trespassing citation issued by the Marana Police Department against Steven Blomquist.

172. The Judge's dismissal order was with prejudice, precluding the refiling of charges.

173. In issuing his dismissal order, the Judge hand wrote onto that order that the citation was an **improper use of the criminal process**.

174. That order was never appealed or contested (hereinafter the order will be referred to as the "Trespass Ruling").

175. That order involved the same parties, the same easement, and the same criminal trespass statute/charge.

176. T.P. Tometich knew that the order had not been appealed or contested.

177. T.P. Tometich had actual knowledge of the Judge's ruling when he ordered his Officers to arrest, and incarcerate, Mr. Blomquist on a trespassing charge.

178. T.P. Tometich had actual knowledge that Mr. Blomquist was on the exact same easement at issue in the previous case resulting in a dismissal with prejudice order.

179. T.P. Tometich knew that the trespassing charge was meritless when he ordered his officers to use it as a basis for incarcerating Mr. Blomquist.

180. Chief T.P. Tometich had not spoken with any officers and did not have any direct knowledge of any activity which would constitute disorderly conduct by Mr. Blomquist when he issued his order.

181.   The order to arrest and incarcerate Steven Blomquist for Disorderly Conduct was based on the Pressure Phone Call.

182.   T.P. Tometich's order to arrest and incarcerate Steven Blomquist was not based on any investigation he conducted or any evidence of disorderly conduct that he witnessed or experienced.

183.   Whether T.P. Tometich acted willfully, or under duress or some perceived threat from the Town, its Mayor, or its Council, is irrelevant to a conspiracy to deprive an individual of their civil rights.

184.   T.P. Tometich and the others involved in the conspiracy intentionally chose to ignore the law when they ordered the incarceration of Steven Blomquist.

185.   T.P. Tometich and the others involved in the conspiracy acted with an evil intent or requisite reckless disregard of Steven Blomquist's rights, knowing that their actions would deprive Steven Blomquist of his freedom.

186.   Chief T.P. Tometich is not entitled to qualified immunity as T.P. Tometich violated clearly established statutory and constitutional rights.

187.   Chief T.P. Tometich is not entitled to qualified immunity as T.P. Tometich was not performing a discretionary duty when he conspired to deprive Steven Blomquist of his civil rights.

188.   Chief T.P. Tometich was under orders from one or more of his superiors on the town council and/or the town manager, to order the arrest and incarceration of Mr. Blomquist.

Roberto's Involvement in the Conspiracy

189.   T.P. Tometich tried to conceal his involvement in the scheme by using a go-between for relaying his orders to conduct the Custodial Arrest based on Trespassing and Disorderly Conduct.

190.   The go-between was an individual (and a defendant) named Roberto (Last Name Unknown) (hereinafter "Defendant Roberto").

191.   T.P. Tometich's attempt at concealment is an acknowledgment of T.P. Tometich's knowledge that he was violating the law and public trust.

192.   Prior to the Custodial Arrest, T. P. Tometich told Defendant Roberto to contact Defendant Officer Tim Brunenkant with orders to have the onsite officers handcuff Mr. Blomquist and haul him to Pima County Jail on charges of trespassing and disorderly conduct.

193.   Defendant Roberto knew that Chief T.P. Tometich did not have, and could not have, firsthand knowledge of any crimes taking place at McClintock's.

194.   Defendant Roberto knew, or should have known, that Chief T.P. Tometich, by ordering the arrest of Steven Blomquist for trespassing and disorderly conduct was violating police procedure.

195.   Defendant Roberto knew, or should have known, that Chief T.P. Tometich had no basis for ordering an incarceration of a protestor and that such an arrest would be improper and a violation of civil rights.

196.   Regardless, Defendant Roberto contacted Marana Police Department's dispatch in an effort to track down Defendant Brunenkant so that he could relay Defendant T.P. Tometich's orders.

197.   Defendant Roberto contacted Marana Dispatch and spoke with Marana Police Department dispatcher Patty (Last Name Unknown) (hereinafter "Patty").

198.   Defendant Roberto had a conversation along the lines of the following with Patty,

Roberto: "Hey, I just got a call from the Chief [Chief T.P. Tometich], apparently there are officers out there at McClintock's right now?"

Patty: "Yep."

Roberto: "Yeah he wants them, uh, he wants them cuffed and taken away."

Patty: "Cuffed and taken away?"

Roberto: "Yep"

Patty: "And you want me to tell them that on the radio?"

Roberto: "Well, I wanted you to get Timmy to call me but . . ."

Patty: "Well"

Roberto: "He's calling me; he's calling me right now."

Patty: "Okay bye."

199.   Defendant Roberto did not know that there was anything going on at McClintock's before getting called by Chief T.P. Tometich.

200.   From the content of the phone call, and Patty's tone of voice, Patty did not want to relay the order over the radio and believed that the arrest would be wrongful.

201.   Shortly after hanging up with Patty, Defendant Roberto called the dispatcher back and spoke with a different dispatcher named "Kelly".

202.   In this second call to the dispatcher, Defendant Roberto asked Kelly to have Marana Police Department Officer Tim Brunenkant call Defendant Roberto's cell phone.

203.   In this second call, Defendant Roberto did not relay to Kelly his intent to order the wrongful arrest of Steven Blomquist.

204.   Defendant Roberto eventually made contact with Defendant Officer Tim Brunenkant and instructed him to have Steven Blomquist arrested for trespassing and disorderly conduct.

205.   Whether Defendant Roberto acted willfully, or under duress or some perceived threat from T.P. Tometich, is irrelevant to a conspiracy to deprive an individual of their civil rights.

206.   Defendant Roberto and the others involved in the conspiracy intentionally chose to ignore the law when they ordered the incarceration of Steven Blomquist.

207.   Defendant Roberto is not entitled to qualified immunity as Defendant Roberto violated clearly established statutory and constitutional rights.

208.   Defendant Roberto is not entitled to qualified immunity as Defendant Roberto was not performing a discretionary duty when he conspired to deprive Steven Blomquist of his civil rights.

209.   Defendant Roberto was under orders from one or more of his superiors in the Town, and acting pursuant to an established Town policy to target the protestors and to order the arrest and incarceration of Mr. Blomquist.

Officer Brunenkant's Involvement in the Conspiracy

210.   When Defendant Roberto called Officer Brunenkant, neither Chief T.P. Tometich nor Defendant Roberto had spoken with the onsite officers, Officer Bennett and Officer Ritter.

211.   Defendant Roberto knew about the Trespass Ruling when he instructed Officer Brunenkant to order Officers Bennett and Ritter to arrest Steven Blomquist for trespassing.

212.   Defendant Roberto knew that he did not have any direct knowledge of any activity which would constitute disorderly conduct by Mr. Blomquist when he instructed Officer Brunenkant to have Mr. Blomquist arrested on that charge.

213.   Officer Brunenkant called Officer Bennett and/or Officer Ritter and instructed them to arrest and incarcerate Mr. Blomquist for disorderly conduct and trespassing.

214.   Defendant Brunenkant knew about the Trespass Ruling when he instructed Officer Bennett and/or Officer Ritter to arrest and incarcerate Steven Blomquist for trespassing.

215.   Defendant Brunenkant knew that he did not have any direct knowledge of any activity which would constitute disorderly conduct

by Mr. Blomquist when he instructed Officer Bennett and/or Officer Ritter to have Mr. Blomquist arrested on that charge.

216.   Whether Defendant Brunenkant acted willfully, or under duress or some perceived threat from Defendant Roberto or others in the conspiracy, is irrelevant to a conspiracy to deprive an individual of their civil rights.

217.   Defendant Brunenkant and the others involved in the conspiracy intentionally chose to ignore the law when they ordered the incarceration of Steven Blomquist.

218.   Defendant Brunenkant is not entitled to qualified immunity as Defendant Brunenkant violated clearly established statutory and constitutional rights.

219.   Defendant Brunenkant is not entitled to qualified immunity as Defendant Brunenkant was not performing a discretionary duty when he conspired to deprive Steven Blomquist of his civil rights.

220.   Defendant Brunenkant was under orders from one or more of his superiors in the Town, and acting pursuant to an established Town policy to target the protestors and to order the arrest and incarceration of Mr. Blomquist.

Officer Bennett's and Officer Ritter's Involvement in the Conspiracy

221.   Officers Bennett and Ritter were both onsite prior to the Custodial Arrest and incarceration.

222.   Officer Ritter was the back-up officer.

223.   At no point did Officer Bennett approach Mr. Blomquist to investigate the issue from Mr. Blomquist's point of view.

224.   At no point prior to Officer Bennett's approach of Mr. Blomquist did anyone ask Mr. Blomquist to leave.

225.   At no point prior to Officer Bennett's approach of Mr. Blomquist did Mr. Blomquist commit any of the predicate acts of disorderly conduct.

226.   At no point prior to Officer Bennett's approach did Officer Ritter approach Mr. Blomquist to investigate whether Mr. Blomquist had committed any crime.

227.   At all times prior to, and including, his arrest, Steven Blomquist was friendly, courteous and respectful to every individual he met.

228.   At all times, including during his arrest, Steven Blomquist was courteous and friendly with Officer Bennett.

229.   Indeed Steven Blomquist regrets the necessity of naming any officers, but needs to do so to protect his civil rights and hopes the officers understand that he sympathizes with their being placed in an

untenable situation by their superiors and by the unknown John and/or Jane Does responsible for creating this situation.

230. Those John and Jane Doe Town Officials behind this plan or scheme have let down the police department, brought disgrace upon distinguished officers, and have left a taint that will not easily be cleaned up.

231. Officer Bennett and Officer Ritter did not arrest any other member of the public on the public easement even though such individuals were present and observed by the officers.

232. Officer Bennett knew that Mr. Blomquist had not committed any of the predicate acts of disorderly conduct.

233. Officer Bennett and Officer Ritter knew about the Trespass Ruling when they arrested and incarcerated Steven Blomquist.

234. Officer Bennett knew that citing Steven Blomquist for trespassing for being in the public easement was an improper use of the criminal code when he cited Steven Blomquist for criminal trespassing.

235. Officer Bennett was unfortunately under orders from those John and Jane Does hiding in the shadows who had directed the chief of police to incarcerate Mr. Blomquist.

236.    Officer Bennett was prohibited by his superiors from asking Mr. Blomquist any questions.

237.    Officer Bennett was prohibited by his superiors from conducting any investigation of Mr. Blomquist's position.

238.    Officer Bennett was prohibited by his superiors from exercising any discretion.

239.    Officer Bennett was under explicit instruction by his superiors to handcuff and double lock Mr. Blomquist.

240.    Officer Bennett was under explicit instructions by his superiors to take Mr. Blomquist into custody.

241.    Officer Bennett was under explicit instructions by his superiors to take Mr. Blomquist to Pima County Jail and have him incarcerated.

242.    Officer Bennett apologized to Mr. Blomquist before arresting him, telling Mr. Blomquist that he was doing something "I don't want to do" but that he was under orders from his Sergeant to take Mr. Blomquist to Pima County Jail.

243.    Officer Bennett did not read Mr. Blomquist his rights.

244.    Officer Bennett did not conduct any investigation other than speaking with Mr. Shultz.

245. Whether Defendant Bennett or Defendant Ritter acted willfully, or under duress or some perceived threat from Defendant Brunenkant or others in the conspiracy, is irrelevant to a conspiracy to deprive an individual of their civil rights.

246. Defendant Bennett, Defendant Ritter and the others involved in the conspiracy intentionally chose to ignore the law when they ordered the incarceration of Steven Blomquist.

247. Defendant Bennett or Defendant Ritter are not entitled to qualified immunity as they violated clearly established statutory and constitutional rights.

248. Defendant Bennett or Defendant Ritter are not entitled to qualified immunity as they were not performing a discretionary duty when they conspired to deprive Steven Blomquist of his civil rights.

249. Indeed, Defendant Bennett specifically told Steven Blomquist that he had no discretion in arresting and incarcerating Steven Blomquist.

250. Defendant Bennett or Defendant Ritter were under orders from one or more of their superiors in the Town, and acting pursuant to an established Town policy to target the protestors and to order the arrest and incarceration of Mr. Blomquist.

**251.  On November 15, 2009, two days after Steven Blomquist's arrest, Marana's Town Manager Gilbert Davidson was greeted at the door to McClintock's with what appeared to be a champagne toast.**

252.  Subsequently, one or more of Mr. Davidson's guests filed reports claiming that protestors "disturbed their peace."

253.  It is believed, though not yet established, that Mr. Davidson may be one of the John Does responsible for conspiring to order Steven Blomquist's arrest.

254.  In all of their nights protesting the Easement, this was the first time ever Plaintiffs saw guests greeted at the door with a champagne toast.

255.  Upon information and belief, the toast, be it champagne or some other drink, was a thank you present for the Town of Marana arresting and hauling Steven Blomquist to Pima County Jail.

256.  All requirements for the finding of punitive damages against these individuals has been met, and they are all personally liable for punitive damages for abusing their offices and the public trust.

Marana's Policy

257.  T.P. Tometich was required to follow the Town Code.

258.   On and before November 13, 2009 the Marana Town Code provided in section 4.1.4:

> Departmental rules and regulations
>
> The police department shall be operated and managed in accordance with the departmental rules and regulations as may from time to time be adopted by the chief of police, with the approval of the council.

259.   The Rules and Regulations implemented and used by T.P. Tometich in arresting Steven Blomquist were specifically approved by the Town Council.

The Town's Liability for its Officer's Unconstitutional Acts

260.   The Town of Marana is liable for the Unconstitutional Acts of its officers, including T.P. Tometich, and other John and Jane Doe defendants who are Town of Marana officers, if and as later discovered.

261.   The Unconstitutional Acts complained of include, *inter alia*, an attempt to stop Steven Blomquist's and Sharyl Cummings expression of free speech in violation of the first amendment, an unreasonable seizure of Mr. Blomquist in violation of the fourth amendment, and a deprivation of Mr. Blomquist's liberty in violation of the fourteenth amendment.

262.   The Unconstitutional Acts were part of Marana's policy as and after a May 21, 2009 Town Council meeting where Town Attorney Frank Cassidy announced that the Town would arrest any member of the public protesting on the public easement.

263.   The Custodial Arrest happened as part of the Town's policy of trying to appease the Developer and to prevent Steven Blomquist and others from exercising their Free Speech rights on any part of the public easement after the Town took the steps to avoid $135 million in personal liability to the developer.

Amending Town Code

264.   On November 23, 2009, at approximately 12:25 PM, Marana's Town Attorney Frank Cassidy was provided a copy of the phone call between Roberto and Patty via e-mail.

265.   After listening to the contents of that e-mail, the Marana Town Attorney's office added an agenda item, Item A.2, to the December 1, 2009 Town Council Agenda.

266.   Item A.2 on the Agenda, as it existed on November 25, 2009 provides in full:

> A 2:    Ordinance No. 2009.24: Relating to the Police Department; amending Town Code Section 4-1-4 ("Departmental Rules and Regulations") to eliminate the requirement for Town Council

approval of Marana Police Department rules and regulations and to establish that police department rules and regulations shall be in compliance with federal and state law, the Town Code and Town ordinances, policies, directives, rules and procedures; and declaring an emergency   (Jane Fairall).

267.  Under this change, the Town Council would not have a right to interfere with the Police Department Rules and Regulations.

268.  Under this change, the Town Council could not order the chief of police to disregard federal law, including the constitutional rights.

269.  This change was necessary because the Chief of Police acted pursuant to his authority/town policy as it existed on November 13, 2009, and that policy allowed and/or required him to ignore federal law and state law (and the Plaintiff's constitutional rights).

<u>CAUSES OF ACTION</u>

III

COUNT ONE

**(Violaton of Civil Rights arising from November 13, 2009 Arrest)**

270.  Plaintiffs incorporate all prior allegations.

271.  Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the

United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

272. The Defendants Town of Marana, T.P. Tometich, Defendant Roberto, Tim Brunenkant, Officer Bennett, Officer Ritter, and/or John or Jane Does are persons within the meaning of 42 USC 1983.

273. The Defendants Town of Marana, T.P. Tometich, Defendant Roberto, Tim Brunenkant, Officer Bennett, Officer Ritter and/or John or Jane Does acted under color of law when they subjected Steve Blomquist to a deprivation of civil rights under the 1st (free speech), 4th (unlawful seizure) and 14th (equal protection) Amendments of the U.S. Constitution as more fully described in the above allegations.

274. The Defendants are not entitled to any immunity for their wrongful actions.

275. The non-municipal defendants, one or more, acted with the requisite wrongful intent and or evil purpose, giving rise to punitive damages.

276. Steven Blomquist was damaged and is entitled to an award of damages.

COUNT TWO

COUNT THREE

**(Violation of Civil Rights – Town Policy to Arrest Protestors)**

277.   Plaintiff incorporates all prior allegations.

278.   The Town of Marana instituted a policy, in concert with Saguaro Ranch and its developer, to target protestors for arrest and harassment in violation of 42 USC 1983.

279.   The Town of Marana regularly and routinely responded to "Trespass" calls knowing that the Easement was a dedicated public easement and a dispute as to the Town's activities in "Abandoning" the easement is currently pending in Pima County Superior Court.

280.   The arrest and citations issued by the Marana Police Department at the end of May and the beginning of June resulted in more than 2 and ½ months of free speech suppression.

281.   The arrest and citations were done maliciously, with evil intent.

282.   The Plaintiffs were damaged as a result.

COUNT FOUR

**(VIOLATION OF CIVIL RIGHTS – POLICY OF STOPPING AND QUESTIONING PROTESTORS)**

283.   Plaintiff incorporates all prior allegations.

284.   The Town of Marana instituted a policy, in concert with Saguaro Ranch and its developer, to target protestors for arrest and harassment in violation of 42 USC 1983.

285.   The purpose of these questioning sessions was to make Plaintiff's uncomfortable and/or to make them give up on their quest to protect the public's right to use the Easement and/or to give up protesting the developers and the Town's wrongful actions.

286.   The plaintiffs were damaged as a result.

COUNT FIVE

**(Policy of Ignoring False Police Reports)**

287.   Plaintiff incorporates all prior allegations.

288.   Plaintiffs regularly and routinely pointed out to those officers who detained them for the numerous, false "trespassing" claims that the individuals were violating ARS 13-2907.01.

289.   The ignoring of the false police reports was part and parcel to a scheme to deprive Plaintiffs of their Civil Rights under 42 USC 1983.

290.   As part and parcel of the scheme to deprive Plaintiff's of their civil rights, the Marana Police Department was precluded from citing any Saguaro Ranch employee for a violation of ARS 13-2907.01

291.   Plaintiff's were damaged as a result, as eventually the Town began coaching the employees on ways to sneak in a criminal charge against the protestors using "innocent third parties.

## COUNT SIX

### (Malicious Prosecution of Citations)

292.   Plaintiff incorporates all prior allegations.

293.   The criminal citations were criminally prosecuted with the intent to squash free speech right guaranteed by the first amendment.

294.   The result terminated in Plaintiffs' favor.

295.   The state prosecuted the action after Marana's citations were issued.

296.   The citations were actuated by malice and a desire to halt the exercise of free speech.

297.   The citations were without probable cause.

298.   Indeed, the judge went above and beyond the neutral form of order, handwriting on the order that the Town of Marana had improperly used the criminal process against Steven Blomquist and Sharyl Cummings.

299.   The town and those acting in concert with it violated 42 USC 1983.

300.   Mr. Blomquist and Ms. Cummings were damaged as a result.

## COUNT SEVEN

### (Civil Rights Citations)

301.   Plaintiff incorporates all prior allegations.

302.   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

303.   The Defendants Town of Marana, Officer Fane, Officer Williams and Officer Montgomery, and/or John or Jane Does are persons within the meaning of 42 USC 1983.

304.   The Defendants Town of Marana, Officer Fane, Officer Williams and Officer Montgomery, and/or John or Jane Does acted under color of law when they subjected Steve Blomquist and Sharyl Cummings to a deprivation of civil rights under the 1st (free speech), 4th (unlawful seizure – detention at arrest) and 14th (equal protection) Amendments of the U.S. Constitution as more fully described in the above allegations.

305.   The Defendants are not entitled to any immunity for their wrongful actions.

306. The non-municipal defendants, one or more, acted with the requisite wrongful intent and or evil purpose, giving rise to punitive damages.

307. Steven Blomquist and Sharyl Cummings were damaged and are entitled to an award of damages.

## COUNT EIGHT

**(Civil Conspiracy to Deprive Rights on November 13, 2009)**

308. Plaintiffs incorporate all prior allegations.

309. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

310. The Defendants T.P. Tometich, Defendant Roberto, Tim Brunenkant, Officer Bennett, Officer Ritter, and/or John or Jane Does (the "Conspiring Defendants") are persons within the meaning of 42 USC 1983.

311. On November 13, 2009, the Conspiring Defendants acted under color of law as they conspired together to deprive Steven Blomquist of civil

rights under the 1st (free speech), 4th (unlawful seizure) and 14th (equal protection) Amendments of the U.S. Constitution as more fully described in the above allegations.

312.   The Conspiring Defendants are not entitled to any immunity for their wrongful actions.

313.   The Conspiring Defendants, one or more, acted with the requisite wrongful intent and or evil purpose, giving rise to punitive damages.

314.   Steven Blomquist was damaged by the conspiracy and is entitled to an award of damages.

<u>DEMAND FOR JURY TRIAL</u>

IV

Pursuant to Rule 38(b), Federal Rules of Civil Procedure, the Plaintiff demands a jury trial on all issues.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following relief from Town of Marana, T.P. Tometich, Defendant Roberto, Tim Brunenkant, Officer Bennett, Officer Ritter, and/or John or Jane Does:

A.   For the Actual and Consequential Damages in an amount determined by a jury for the violation Steven Blomquist's civil rights arising from the arrest and incarceration Pima County jail;

B.      For interest on said sum at the legal rate per annum until paid;

C.      Reasonable attorney's fees and costs as provided by 42 USC 1988 or as otherwise required by law; and

D.      For such other and further relief as the Court deems just and proper.

**RESPECTFULLY SUBMITTED** this 25<u>th</u> day of May, 2010.

WEEKS & LAIRD PLLC

By:   s/ Stephen Weeks
      STEPHEN M. WEEKS
      Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2010, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Andrew J. Petersen
Humphrey & Petersen, P.C.
3861 E. 3rd St.
Tucson, AZ 85716
Attorney for Defendants

By:   s/ Stephen Weeks
      STEPHEN M. WEEKS
      Attorney for Plaintiffs